**John Peterson, Appellee, v. Sears, Roebuck & Company, Appellant.**

**Gen. No. 14,015.**

1. MASTER AND SERVANT—*when relation of fellow-servants exists, as a matter of law.* Held, under the evidence in this case, that the particular servants in question, engaged in the work of greasing an elevator, were fellow-servants as a matter of law.

2. MASTER AND SERVANT—*when risk assumed.* Where it appears that a servant had full and complete knowledge of the defect which caused his injury and appreciated the danger arising therefrom, he is deemed to have assumed the risk.

Action in case for personal injuries. Appeal from the Superior Court of Cook county; the Hon. THEODORE BRENTANO, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1907. Reversed with finding of fact. Opinion filed June 16, 1908.

**Statement by the Court.** The plaintiff in this action for personal injury, John Peterson, was on July 11, 1904, in the employ of Sears, Roebuck & Company, appellant, as helper on a freight elevator, controlled and operated by appellant. The operator of the elevator was one Tobin, who had been operating the car in question about two years. Peterson had been working upon the car as helper four or five months continuously before the date mentioned above. He had been working for appellant about nine or ten months, but for the first few months he was working on other elevators and at other work about appellant's building in Chicago.

During the four or five months immediately preceding the accident which gave rise to this suit, Tobin and appellee were together upon this car the whole of each day between eight o'clock in the morning and five o'clock in the evening, except a half hour for luncheon. Tobin's duties were loading and unloading freight and operating the car. Appellee's duties were loading and unloading freight and opening and closing the doors of the elevator shaft. They acted together in loading the freight from the sidewalk onto the car, and unloading the freight from the car onto the various floors of the building. The plaintiff, appellee, operated the elevator every day between 11:30 and 12 noon, while Tobin was at lunch. He also operated the car frequently at other times during the day, when Tobin requested him.

The rules of appellant company required appellee

to grease the guides of the elevator every Monday morning. The guides are two strips of wood or iron extending up and down the shaft, one in the middle of the north side of the shaft and the other in the middle of south side. Each guide engaged a groove in the structure of the car. It was necessary to keep the guides well lubricated in order that the car might slip easily and smoothly along them. The rules of appellant governing the work of the elevator men provided the manner in which this work should be done. They provided that the helper should grease the guides while the operator moved the car up and down.

This work of greasing the guides had been done by appellee and Tobin in the same manner in which it was being done on July 11, 1904, at the time of the accident. Appellant always got astride of the cross-beam and put on the grease with a brush while Tobin moved the car slowly up and down, appellee meantime giving directions to Tobin as to when to start and stop. He was so directing Tobin on the morning of the accident.

Appellee's statement of the accident is that he was greasing the south guide going up, and when the car was about half way up the shaft the speed of the car suddenly increased from half speed, which was the customary speed for greasing, to full speed, and continued until it reached the top of the shaft, and squeezed him down flat on the beam, between it and some horizontal planks fixed in the shaft just below the sheaves for the hoisting cables.

Tobin's story, on the other hand, is that they went all the way up the shaft at low or half speed in the ordinary way, but for some reason he did not stop the car at a safe distance below the top of the shaft, as was his custom. On the contrary he ran his car up even with the eighth floor before throwing his lever to the center and cutting off the current, and that thereby the car was caused to move a foot and a half or thereabouts above the eighth floor, leaving but

twelve or thirteen inches between the top of the beam and the horizontal plank, and the plaintiff's body was crushed upon the beam.

The elevator car and machinery were in perfect condition. The controlling device for stopping and starting the elevator was of the most approved make, and in perfect condition. The elevator was also equipped with the customary automatic stopping device, designed to slow down and stop the car at either end of the shaft, in case the car should get beyond control. This automatic stopping device was designed merely to prevent the car in case of accident from striking the end of the shaft a heavy blow, and thereby injuring persons in the car.

After the accident the elevator machinery and appliances were carefully examined and tested. It was found that the controlling device and safety devices operated perfectly. The car when examined immediately after the accident and before it had been moved, was shown to have been stopped by the automatic stops, or so-called limits safety devices, thus showing that Tobin had allowed the car to run to the eighth floor without making any attempt to stop it.

On the trial the jury returned a verdict of $10,000 against appellant; and after overruling a motion for a new trial, the court entered judgment on the verdict.

LACKNER, BUTZ & MILLER and W. G. SHOCKEY, for appellant.

C. STUART BEATTIE, for appellee.

MR. JUSTICE SMITH delivered the opinion of the court.

The original declaration consisted of three counts. The first count averred that the defendant negligently propelled the elevator upward with excessive and improper speed. The second count averred that the defendant negligently failed to equip the elevator with

proper stopping devices whereby the same could be controlled, and because of the want of such stopping devices the defendant was unable to operate and stop the elevator in a reasonably safe and proper manner. The third count averred that the defendant negligently permitted the stopping device and appliances to be so worn and out of repair that the defendant could not operate and stop the elevator in a reasonably safe and proper manner.

By leave of court the plaintiff filed two additional counts. The first additional count averred that the defendant so negligently propelled the elevator upward that plaintiff was caught, etc. The second additional count avers that the defendant negligently failed to have ordinary and reasonable stopping devices and appliances upon the car, by reason whereof the defendant was unable to stop the car in a reasonably safe and proper manner.

At the close of the plaintiff's evidence, and again at the close of all the evidence, appellant moved the court, and tendered each time with its motion a written instruction, to direct the jury to find the defendant not guilty. The court on each occasion denied the motion, and marked the instruction "Refused." Appellant here insists that the motion to instruct for the defendant should have been sustained, and the instruction given. In our opinion the instruction should have been given on two grounds: first, the negligence causing the injury, shown by the evidence was that of a fellow-servant; and second, the evidence fails to prove the negligence averred in the declaration or any count thereof.

Upon the question of the relations between appellee and Tobin at the time of the injury of appellee there is no controversy of fact in the record. They were co-operating in the work of greasing the guides. This work required two men, one to apply the grease, and the other to move the car in a manner to enable the man applying the grease to do his work. Rule 8 of

appellant provided that, "All machinery of the elevator will be oiled and cleaned by the engineering department, except the elevator guides, the ram and cross-head guides, which will be greased and oiled by the elevator helper, while the operator controls the moving of the car." Appellee and Tobin were working pursuant to this rule when appellee was injured. They were doing the work which it was their duty to do every Monday morning. Appellee had been performing this usual and customary work for four or five months in connection with Tobin in the same manner as it was being done when appellee was injured. While Rule 4 of appellant states: "The elevator operator is in charge of the elevator and will operate it at all times. The helper will be subordinate to the operator and will work directly under his instructions," in this part of their work, it was necessary that Tobin should receive directions from time to time as to starting and stopping the car, from appellee. Appellee testifies: "When the grease on my brush would run out, if it was thick, I had to stop him all the time to get more grease. I would tell him when to stop and when to start. On this morning of the accident he stopped and started a few times whenever I told him to." Appellee could not do his work properly unless the car was so moved, that while sitting on the cross-beam he could reach with his brush every point on the guides. And it was Tobin's duty to regulate the movement of the car as directed by appellee, so that appellee would be carried within reach of the point where his work was to be done when he was ready for it. Hence, appellee and Tobin were in constant communication and collaboration while engaged in the work which they were doing at the time of the accident. Appellee held the greasy brush against the guide while Tobin ran the car, and thereby ran the brush along the guide. Without Tobin's help appellee could not have greased the guide, except in one spot or portion within his reach

at a particular time. The work required both of them, each aiding the other.

Furthermore, these men were associated together in their work of running the elevator and handling the freight carried in the car every day during working hours. This had been their association for four or five successive months. Each worked all this time with the other, and neither of them with any other person. Their consociation was for that period of time peculiarly close in point of space, as well as intimacy. They were at work under the same boss, Mullen. Tobin had authority to direct appellee in the absence of Mullen, but Mullen was the man who exercised the real authority. Appellee testifies: "Mullen had charge of all the elevators. Murphy is the highest man on the shipping floor, and Mullen was under him. Mullen was my boss and the boss of all the elevator men."

Loading and unloading freight into and from the elevator were the duties of Tobin as well as of appellee. Tobin and appellee acted together in handling the freight. When moving the car Tobin stood at the controller in the northwest corner of the car, and appellee stood at the southwest corner of the car and opened and closed the doors. Appellee operated the car while Tobin was at lunch, and frequently operated it at other times during the day, whenever Tobin requested him to do so. They were therefore doing the same duties in the same car in all things, except when both were present Tobin operated the car while appellee opened and closed the door. They, therefore, "had ample opportunity to exercise each upon the other, an influence promotive of care and prudence in the matter of performing the work, upon the proper performance of which work depended the safety of each of them. The duties of appellee and the said Swick (Tobin) were therefore such as brought them into habitual association and enabled each of them to exercise a mutual influence upon the other, promotive of

proper caution, to the end that neither might suffer injury by reason of the failure of the other to perform his work in a faithful and careful manner.'' Illinois Steel Co. v. Coffey, 205 Ill. 206. To an exceptional degree, while greasing the guides the safety of appellee depended upon the exercise of constant care by Tobin.

The evidence clearly establishes, we think, the relation of fellow-servants between appellee and Tobin. Chicago City Ry. Co. v. Leach, 208 Ill. 198; Crane Co. v. Hogan, 228 *id.* 338; Pagels v. Meyer, 193 *id.* 172; World's Columbian Exposition Co. v. Lehigh, 196 *id.* 612; C. & E. I. R. R. Co. v. Driscoll, 176 *id.* 330.

The evidence shows beyond any reasonable doubt that the proximate cause of appellee's injury was the failure of Tobin to stop the car at the safe and proper point. Tobin testifies that he never had any trouble in stopping the car when he got to the top, but if he did not stop it before he got to the floor it might slide a few inches. He says he did not throw his controller at the time of the accident, until he got to the eighth floor, and the car slid from fifteen to eighteen inches, the distance it always slid after the controller was thrown to the center; that in stopping the elevator at a floor the controller should be moved nearly to the center when the car was about two feet from the floor, and when about six inches of the floor the controller should be brought to the center; that he never had any trouble in stopping the elevator where he wanted to, and it was in good condition at the time of the accident. He went right on using the elevator after the accident without any changes being made upon it, and the elevator stopped when the controller was thrown to the center after the accident the same as before.

The evidence shows that Tobin having failed to stop the elevator at the proper place, the automatic limit safety devices had acted and stopped the car about eighteen inches above the eighth floor. The action of the automatic safety devices shows, according to the

testimony, that Tobin had allowed the car to run to the eighth floor without making any attempt to stop it. Whether the version of appellee as to the manner of the accident be taken as true, or whether Tobin's version of it be taken, the happening of the accident was due to the carelessness of Tobin, and to no other cause.

Against this view of the case the attorney for appellee interposes an argument to the effect that Tobin was the direct representative of the appellant—a vice principal—that Tobin and appellee were not fellow-servants, and the injury to appellee was the direct result of the exercise of the authority conferred upon Tobin over appellee, and that appellant is therefore liable for Tobin's negligence.

We have carefully weighed this argument and the authorities cited in support of it, in view of the serious injury suffered by appellee and the importance of our decision of the case to him, but, under the evidence and the law of this. state, we are compelled to withhold our assent to appellee's contention. We can reach no other conclusion than that above expressed, namely, that appellee and Tobin were fellow-servants and that the sole cause of the injury to appellee was the negligence of Tobin.

We come now to the second question—Does the evidence sustain the averments of negligence in either count of the declaration?

The negligence averred in the first original count and in the first additional count of the declaration is that appellant negligently propelled the car upward. The evidence, in our opinion, fails to prove this charge.

The second original count and the second additional count aver that the appellant negligently failed to equip the elevator with ordinary and reasonable and proper stopping devices and appliances by reason whereof appellant was unable to stop the car in a reasonably safe and proper manner.

The evidence shows, in our opinion, that the elevator was perfectly equipped with reasonable and proper stopping devices and appliances which acted perfectly as they were designed to act. Tobin, through unaccountable negligence, failed to handle the controller properly. This appliance was in perfect condition and would have stopped the car at a safe place, if it had been applied at the proper time. The evidence shows, as we have seen, that the car was stopped by the automatic limit safety device, and had it failed to act, appellee would have been crushed to death between the cross-beam and the plank.

The averment of negligence in the third original count, that appellant had negligently permitted the stopping device and appliances to be so worn and out of repair that appellant could not stop the elevator in a reasonably safe and proper manner, is not sustained by the evidence, for the reason given above in discussing the evidence on the other counts of the declaration.

It is urged, however, that the evidence shows that when the elevator was originally constructed so that when the car had run eighteen inches above the top floor of the building there was left a space of four or five feet between the cross-beam on which appellee was seated and the cable sheaves in the top of the shaft, but by subsequently placing the planks so far below the sheaves as they were, the stopping devices and appliances were rendered unreasonable, improper and unsafe, for the reason that only about eleven inches of space was left between the cross-beam and the plank when the automatic stopping device stopped the car.

The planks were put there some time after the elevator was installed, and before appellee commenced working on the elevator, to make the sheaves accessible for oiling. The planks were in no sense a part of the stopping or safety devices of the elevator. Counsel for appellee in his brief states: "It is evident that these boards which caught plaintiff's back

inside the elevator shaft were no part of the elevator equipment.''

The argument of appellee upon this point is, that when the best elevator makers in the country put the stopping devices of the elevator so that the top beam of the elevator does not come within four or five feet of the sheaves at the top, it is for the purpose of leaving sufficient space for a man to go safely upon the beam for cleaning, oiling or inspecting purposes. And when appellant knowingly allowed the space to be cut down to thirty-one inches and permits his employe to go upon the beam without information or knowledge that the slightest carelessness of the operator will further cut the space down to eleven inches, appellant was guilty of negligence.

There are several answers to this contention. First, it is without basis in the pleadings or proofs. Assuming that the placing of planks in the top of the elevator shaft for the purpose stated would be negligence, there is no averment of this negligence in any count of the declaration. Then again, there is no proof that the space was left there for the purpose asserted. Third, appellee, having greased the guides for four or five months in the same way, had as much knowledge of the situation as appellant, for the planks were in plain sight. Appellee had ridden up and down this shaft many times every day for four or five months. In Biedler v. Branshaw, 200 Ill. 425, a passenger who had been on the elevator but a few times comparatively was held as a matter of law to be chargeable with notice of a danger much less apparent than this. The proof shows that appellee had full and complete knowledge of the defect, if it was a defect, above suggested. McCormick Machine Co. v. Zakzewski, 220 Ill. 522; Montgomery Coal Co. v. Barringer, 218 id. 327. He therefore assumed the risk of being injured, and appellant is not liable.

For the reasons indicated the judgment of the Superior Court is reversed, with a finding of fact.

*Reversed with finding of fact.*